| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

| | | |
|---|---|---|
| JAMES MAYFIELD, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| *versus* | § § | CIVIL ACTION H-04-483 |
| | § § | |
| LOCKHEED MARTIN ENGINEERING AND, SCIENCE SERVICES CO., | § § § | |
| Defendants. | § | |

## Amended Opinion on Summary Judgment

1. *Introduction.*

   Acting as a representative of the United States, a man sues a governmental contractor. He says that the contractor fraudulently procured its contract and then based on the initial fraud asked for and accepted payments. Both sides have moved for summary judgment. The contractor will prevail.

2. *Background.*

   In 1993, NASA solicited bids for what it called the Evaluating, Testing and Analysis Contract. It replaced the Engineering Support Contract of 1987, on which Lockheed Martin Engineering and Sciences Company had been the primary contractor for about six years. The 1993 contract, like its predecessor, was a "level of effort" contract. Under this arrangement, the contractor promises to supply labor for a specific number of hours, rather than a particular product. To allow contractors to prepare bids, NASA gave them (a) the hours needed – 13,411,404 over five years, plus or minus 15%, (b) an abstract and lengthy description of work, and (c) a staffing model.

   Lockheed wanted the contract and, arguably, was favored because its labor force

was in place at NASA. When preparing the bid, Lockheed found that, although the work seemed comparable to the prior contract, the proposed mix of labor skills was lower. Because the contractor did not know how or if this apparent underestimation would become manifest in the actual task orders, it admits that it "hedged its bets," using the proposed workforce for its estimate.

Lockheed won the bid, and on December 23, 1993, the parties executed the contract. The initial term was January 1, 1994, through September 30, 1998. NASA could extend the term for one year and, then, an additional four.

Throughout the contract term, NASA assigned tasks, and Lockheed selected and organized the work and workers to perform them. Lockheed was entitled to reimbursement of all reasonable and allowable costs, including labor, materials, and facilities. Although the contract included a space where NASA could have designated ceiling costs – making expenditures in excess of that amount unallowable – no ceilings were specified.

NASA required that Lockheed submit monthly financial reports. The reports included the actual hours worked and costs incurred, plus short-term projections of the hours and cost to complete the contract. In a separate form, Lockheed requested reimbursement.

Lockheed's profit was derived from discretionary "performance awards." An independent board of NASA technical and administrative personnel awarded the fees based on a 100 point scale. Up to 30 points were awarded for cost performance and 70 for technical performance. The final score equaled the percentage of the available fee – listed in the contract – that was awarded to Lockheed. A cumulative score under 60 precluded Lockheed from any award for that period. Lockheed could request reconsideration, but it could not appeal NASA's final determination. The initial fee was based on the first three-month period of the contract. It was followed by nine periods of six-months.

Within the first three months of the contract, Lockheed and NASA both knew that costs were higher than those projected in the bid – by 13.7%. Lockheed says the technical demands in the tasks NASA ordered exceeded those estimated in the solicitation, requiring a more skilled – and costly – workforce. In the first evaluation,

primarily because of the cost levels, NASA paid only 76% of the available award. In June, it required Lockheed to prepare and submit a written "cost recovery program" – a plan to align costs with the bid. (Jt. Ex. 206; Ex. 16 to Parten Dep.) By the second evaluation, increasing costs contributed to a zero award fee – a loss to Lockheed of $3.5 million in potential income. Meanwhile, however, NASA praised Lockheed's technical performance. In fact, some at NASA argued against demanding lower costs because they believed that it would compromise Lockheed's technical performance. (Welch Dep. 129:3-11)

The recovery program was effective. By the third evaluation, the board noted improvements. In 1994, Lockheed laid off workers to reduce labor costs. (Jt. Ex. 263) In 1998, NASA extended the contract, and the parties converted it to a "completion form contract." NASA then evaluated overall cost performance, rather than each labor hour. With less NASA participation in management, Lockheed decided how to accomplish tasks, and costs decreased. Although Lockheed's hourly costs remained above the baseline, the aggregate was below. NASA maintained the contract, and it eventually renewed the contract a second time for a total extension of five years.

3. *Claim.*

In 1996, James Mayfield – a former Lockheed employee – sued Lockheed for wrongful discharge. He argued that Lockheed fired him for complaining about what he perceived to be inaccurate information in reports to NASA. The trial court held that even if what Mayfield said was true, he had no claim under Texas law, and it granted summary judgment for Lockheed. The decision was appealed and affirmed. *Mayfield v. Lockheed Eng'g & Seis. Co.*, 970 S.W.2d 185 (Tex.App. – Houston [14th Dist.] 1998, *pet. denied*).

Now, Mayfield brings this action for the government under the False Claims Act. He says that Lockheed submitted a false bid to win the contract when it knew that actual costs would be much higher. The fraud was a bid lower than Lockheed could reasonably anticipate its cost to do the work. He asserts that because the bid was fraudulent, each claim for payment was a false demand.

Also, Mayfield independently accuses Lockheed of charging the government for rent on an office building that was not contemplated in the offer.

4. *Jurisdiction.*

From January 1994 through March 1995, Mayfield prepared and executed Lockheed's cost reports to NASA. In his wrongful discharge suit, he alleged that Lockheed fired him for complaining about erroneous projections in those reports. The disclosures in that case simply added to what Mayfield had been complaining about. He brings this lawsuit for fraud that he believes began while he worked at Lockheed and continued after he was fired.

Because Mayfield had direct and independent knowledge of the facts reported in his case of 1996, this court had jurisdiction to hear the qui tam suit based on that information. *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 354 (5th Cir. 2003).

5. *Fraudulent Bid.*

Mayfield asserts that Lockheed fraudulently secured the contract with a false bid. He then argues that every claim for reimbursement is a false claim because it exceeded that original estimate. He misunderstands the law.

The False Claims Act imposes liability on a person who:

(1) knowingly presents. . . . to an officer or employee of the United States Government . . . . a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes . . . . a false record or statement to get a false . . . . claim paid or approved by the Government . . .

31 U.S.C. §3729.

Here, Mayfield does not dispute the authenticity of the actual costs that comprised the bid. Instead, he asserts that liability attaches to each claim submitted under the fraudulently procured contract.

In support of his theory, Mayfield refers to decisions that are missing at least two critical facts found here: (a) an inherently uncertain contract and (b) ratification by the government. See *U.S. v. Hess*, 317 U.S. 537 (1943)(holding that collusive bidding produced false claims), *Harrison v. Westinghouse Savannah River Co.*, 176 F. 3d 776 (4th Cir. 1999)(holding that a contractor's categorical lies about the benefit to the government

in sub-contracting work could make each claim for reimbursement illegal).

Lockheed's bid was derived from the application of its hourly rates to the workforce suggested by NASA – the workforce NASA demanded that bidders use in their proposals. In practice, however, the work that NASA assigned required more skilled labor than there was in the bid solicitation. NASA workers, as well as Mayfield, admit that the work was the same complexity as the previous contract. (Mayfield Dep. 83:4-9, May 18, 2004)

Mayfield says that Lockheed had a duty to tell NASA if the task orders required work that was not contemplated in the bid or proposal. It, he says, should not have done the work at a higher expense without notifying NASA. Assuming that Lockheed was obliged to notify NASA that its requests exceeded its own proposal, Lockheed's late notice would generate a claim for breach of contract – not fraud. Regardless, Lockheed did notify NASA; it reported costs monthly. In turn, NASA evaluated efficiency, demanded change, and withheld portions of Lockheed's fee. NASA paid every claim for costs, and it awarded fees for cost and technical efficiency in all but one evaluation period.

NASA admits that it, too, was responsible for unexpected costs. NASA frequently ordered more hours than the baseline. It also added a significant project. The contract originally purposed a space-station option. Just before the parties signed the agreement, however, NASA decided not exercise the option. By then, Lockheed was already working on space-station tasks and asked how to proceed. NASA directed Lockheed to complete the tasks, yet it never reinstated the option or revised the hours allocated on the contract.

Through the contract, the parties established a relationship – a system of working together. Neither the tasks to be done nor the time and skill that would be required could be specified. Based on these inherent uncertainties, the parties engaged in a constant dialogue about tasks and time – about productivity and costs. See 48 CFR §16.301-2(1993)("cost-reimbursement contracts are suitable for use only when uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract.") This type of relational contract precludes well-defined obligations and requires nontraditional supervision mechanisms. See Charles J. Goetz & Robert E. Scott, *Principles of Relational Contracts*,

67 Va. L. Rev. 1089 (1981). NASA knew this and, therefore, controlled Lockheed's revenues and closely supervised progress through individual task orders and frequent reports. There simply is no evidence suggesting that the government was duped.

6.   *Overrun Prediction.*

Next, Mayfield says that even if Lockheed did not fraudulently bid, it should have reported the early overages and extrapolated them over the life of the contract in the monthly reports. Instead, he says, Lockheed manipulated reported "target hours" and "cost at completion" to meet the contract. He says that the contract mandated accurate reporting, and that Lockheed impliedly certified that it was in compliance when it accepted the fees. This, he says, is a violation of the law.

Lockheed initially estimated the cost at completion by subtracting the current costs from the contract value. Around September 1994 – after the second evaluation – NASA demanded that Lockheed actually calculate its best estimate of the cost to complete the contract. It also required a supplemental financial report. By January 1995, several corrections were made, and Mayfield reported to NASA that the estimates were accurate. Lockheed also initiated an investigation by its internal auditors that concluded that the reports were commercially reasonable.

Mayfield argues that these discussions prove that NASA was not accepting the overruns. It actually proves the opposite, and it defeats his allegations of fraud. By the end of the third period, although costs were still high, NASA acknowledged "the notable improvement in cost performance experienced during this period as a result of the cost control measures implemented by [Lockheed]." (Jt. Ex. 287) When the parties converted and extended the contract in 1998, they talked more about costs. The record is replete with candid correspondence and testimony about NASA's displeasure with the situation. NASA had the numbers, and it continued to reimburse the costs and pay the fees. Regardless of the reported estimates to complete the contract, NASA knew that costs were higher than the original prediction, and it cared only about effective completion – not deviations from the initial or adjusted estimate.

Fraud must be predicated on a present material fact. The *estimates* were a planning tool, not a claim or demand. (Ex. 271 at 3-10, noting that the reports were not

binding on the contractor or NASA)  Lockheed's awards were not contingent on the estimates.  The interim cost projections were not material, nor were they presented as fact. *U.S. v. Southland Mgmt. Corp.*, 326 F.3d 669 (5th Cir. 2003)(*en banc*); *S. Sur. Co. v. Adams*, 34 S.W.2d 789,791 (Tex. 1930).  They cannot be the basis of liability.

7.  *Office Building.*

The contract contemplated that Lockheed would use two office buildings – Lockheed Plaza 1 and 2.  For nine months, however, Lockheed used and billed NASA for Lockheed Plaza 4.  Mayfield says that Lockheed represented that these payments were covered or proper under the contract, concealing from NASA that the space was excess capacity.  Again, his claim is negated by NASA's knowledge of the actual nature of the claims for payment.

Mayfield argues that NASA did not know about Plaza 4.  The record demonstrates otherwise.  (Jt. Ex. 206) NASA paid for Plaza 4 for the first six months of the contract.  In June 1994, it told Lockheed that it would stop paying in September.  If NASA had been ignorant or deceived into compensating Lockheed,  it could not have discussed it with Lockheed much less have given Lockheed three months to make other arrangements.

Also, NASA ended the previous contract before the scheduled termination.  Lockheed disputed the decision, particularly because it had leased Plaza 4 for the full term.  The evidence suggests that the parties struck a deal.  In return for Lockheed foregoing a claim that NASA terminated the contract for its convenience – making it liable for costs – NASA agreed to take care of the building costs if Lockheed was awarded the follow-up contract. (Mayfield Dep.  71:2-73:21, May 18, 2004).

The contracting officer permitted the expense, and then later changed her mind.  (Jt. Ex. 206)  Mayfield's disapproval of her decision does not make it illegal.  Again, his claims fail.

8.  *Ratification and Waiver.*

Lockheed worked as the prime contractor for NASA on the contract of 1987.  Following that six and one-half year relationship, NASA awarded it the next contract of 1993.  The relationship continued for a decade.

There is no evidence that Lockheed submitted a false bid. Assuming that it did, NASA ratified the contract with absolute knowledge of the fraud. NASA knew the bid, it knew the tasks, and it knew the labor costs. NASA regularly reviewed Lockheed's expenses and evaluated its performance. In response, it had two choices: (a) rescind the contract or (b) waive the fraud by either negotiating an adjustment or ignoring it. NASA chose the latter.

The government also waived the right to complain about Plaza 4. The record shows that it knew about the building, paid for it, and then stopped. Rational people do not offer to continue paying as debts something that they believe that they are being cheated out of - neither did NASA.

The contract states that, in 1998, NASA will exercise the extension only if "performance has met the government's expectations." (Jt. Ex. 2) NASA did, therefore, it is precluded from assessing liability now.

9.   *Conclusion.*

It is clear that Lockheed significantly underbid the contract. Still, Mayfield has no claim. NASA knew that the work in the 1993 contract would be similar to that of the previous contract, yet it requested a lower skilled workforce. It also knew that Lockheed consistently exceeded the projected costs. Likewise, NASA knew that Lockheed billed it for the idle capacity in Plaza 4. Still, it continued the contract. It cannot now claim – through Mayfield – that the contract was procured or sustained through fraud. The government will take nothing from Lockheed.

Signed February 9, 2006, at Houston, Texas.

Lynn N. Hughes  USDJ
United States District Judge